UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THEODORE SWINCKI,

                    Plaintiff,                              Case No. 07-13596

vs.                                                         DISTRICT JUDGE SEAN F. COX
                                                            MAGISTRATE JUDGE STEVEN D. PEPE

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.
===========================/


REPORT AND RECOMMENDATION

I.      BACKGROUND

        Theodore Swincki brought this action under 42 U.S.C. § 405(g) for judicial review of the

Commissioner's final decision that Plaintiff was not entitled to Disability Insurance Benefits

("DIB") under Title II of the Social Security Act.  Both parties have filed motions for summary

Judgment, which have been referred pursuant to 28 U.S.C. § 636(b)(1)(B) and (C).  For the

following reasons, it is RECOMMENDED that Plaintiff's Motion for Summary Judgment be

DENIED and Defendant's Motion for Summary Judgment be GRANTED.

        A.      Procedural History

        In February 2002, Plaintiff applied for DIB alleging disability since March 4, 1996, due

to problems with his left wrist and back (R. 85, 155).[1]  After Plaintiff's claim  was denied upon

initial review (R. 51), an administrative hearing was held on November 8, 2004, at which

_____

        [1] Previous to the current application for benefits, Mr. Swincki had also applied for
benefits in September 2000 (R. 78).

1

Plaintiff was represented by attorney, Kathy Powell (R. 430). Vocational Expert ("VE") Gail Corn also testified (R. 451). At the administrative hearing, Plaintiff amended his alleged onset date to April 1, 2002 (R. 432). In a July 29, 2005, decision, Administrative Law Judge ("ALJ") Andrew F. Tranovich found Plaintiff was not entitled to a period of DIB because Plaintiff was not disabled on or before December 31, 2002, the date the Plaintiff last met the special earnings requirement of Title II of the Social Security Act (R. 32). Despite Plaintiff's impairments, the ALJ determined he could perform a range of light work that included a significant number of jobs (R. 12-32). This became the Commissioner's final decision when the Appeals Council denied Plaintiff's request for review on June 24, 2007 (R. 5).

### B.    Background Facts

#### 1.    Plaintiff's Testimony and Statements

Plaintiff, Theodore Swincki, was 51 years old on December 31, 2002, the date he was last insured for Title II benefits (R.. 85, 95). Plaintiff has a high school GED and has worked as a production machine operator and "production checker" (R. 156, 161, 164).

At the administrative hearing, Plaintiff amended his alleged onset date to "April, not the lst, 2002" (R. 432 referring to R. 277). The critical period of time at issue in this case therefore is from April not the first, 2002, to December 31, 2002.

At the hearing, Mr. Swincki described his condition, between April of 2002 and December of 2002, as including problems with his right hand, left shoulder and back; he stated he had trouble with standing on concrete because of varicose veins (R. 437). He stated that he could "stand for roughly half  hour to maybe an hour," after which his back would "give out . . . legs would shake and that would be the sign to sit down or fall down" (R. 439).

With regard to his hand, Mr. Swincki testified that he received injections "with cortisone and Novocain," which would "numb the hand so that I could move it" (R. 443). Mr. Swincki added that the surgery "corrected the problem that I was experiencing but it weakened my grip, it weakened my hand. The ability to do normal things around the house, cook, clean, it seemed to interrupt, I couldn't do that as well. My grip was gone."

Mr. Swincki also stated that he had to "make an adjustment around the house where I bought an oversized pen and I bought oversized large utensils around so that I could hold onto them with a little bit of ease because I have no grip" (R. 444).

With regard to his shoulder, during the period of time in question, Mr. Swincki stated that the "pain was severe, the ability to use that shoulder, it wasn't there . . . couldn't raise my arm, couldn't extend it over my head. I couldn't pick up anything from the floor and bring it up to the table" (R. 446).

Mr. Swincki testified that his "standing ability at a sink or at the sink in the bathroom or the one in the kitchen is, leaning over it, it just kills my back. I can't stand for five minutes and I have to take a break and I just can't stand there. . . . I can only stand and bend over and do things for a short, very short limited time" (R. 448).

On March 13, 2002, the Plaintiff indicated he could walk maybe a mile or less, taking 15 to 20 minutes (R. 176). Plaintiff did not have any side effects from the medication he was taking (R. 178).

The record reveals that from April to December 2002, Plaintiff cooked, occasionally used the dishwasher, sometimes did the laundry, and occasionally vacuumed (R. 172-73, 447). He also drove, cared for his cat, and watched birds and squirrels (R. 446, 448).

    **2.**    ***Medical Evidence***

On October 30, 2000, a consultative examination by S. Rudraraju, M.D., indicated the only medication Plaintiff was taking for pain was 4 tablets of over-the-counter Tylenol or Advil per day (R. 218). Plaintiff stated he could walk about one mile and climb 12 steps. He denied headaches, visual problems, hearing problems, chest pain or palpitations, shortness of breath or a cough.

At the time of the examination, Plaintiff was 49 years old, obese, height 73 inches, weight 311 pounds, and blood pressure 144/80. Plaintiff could stand erect without support, there was a surgical scar present in the lumbar area with no keloid formation, minimal tenderness in the lumbar and lumbosacral spine, no paraspinal muscle spasm, and all movements of the cervical spine were normal and pain free (R. 219). Dorsal lumbar spine range of motion was flexion 60 degrees 90 degrees normal range; extension 20 of 30 degrees normal; bilateral flexion 20 of 30 degrees normal; bilateral rotation 20 of 30 degrees normal, and straight leg raising was positive bilaterally at 50 degrees. There was a surgical scar over the right ankle area, minimal swelling of the right ankle with diminished movement, dorsi-flexion 10 of 20 degrees normal; plantar-flexion 20 degrees of 40 degrees normal; inversion 20 of 30 degrees normal; and eversion 10 degrees of 20 degrees normal (R. 222).

The knee movements were restricted, flexion 110 of 150 degrees normal bilaterally; and extension normal bilaterally. There was no obvious swelling of the knees or tenderness, other joint exams were essentially normal, hand grip was fairly good bilaterally, and no wasting of the muscles around the joints (R. 219). Plaintiff could ambulate fairly well without any aids, tandem walk, but could not walk tiptoe or on the heel, could not stoop, squat, or arise from squatting position. He got on and off the examination table, got up from supine position, dressed and

undressed, and opened the door.  Memory was good, speech was normal, he was oriented to time, place, and person, and cranial nerves II-XII, power, tone, sensations, and cerebellar functions normal.  Reflexes were normal, plantar flexor on both sides, and Romberg's test negative.  Plaintiff could sit, bend, carry 10 to 20 pounds, push, pull, button clothes, tie shoes, dress-undress, dial a telephone, open door, make a fist, pick up a coin, pick up a pencil, write, get on and off the examining table, climb stairs, perform finger to finger movements, perform finger to nose movements, and perform heel to shin movements (R. 223).

Dr. Rudraraju opined that Plaintiff had diminished range of motion of his back, was neurologically intact, gait was unremarkable, and there was slight diminution in range of motion of his left knee.  Varicose veins were observed about his ankles, he had some swelling about his right ankle with diminished range of motion ofthe right ankle.  A diagnosis of degenerative disc disease, lumbar spine; minimal degenerative joint disease, right ankle; minimal degenerative disease, knees; diabetes, controlled by diet alone; and obesity, was made (R. 219).

On November 16, 2000, state examiner, Byong D. Choi, M.D., indicated the Plaintiff could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk, with normal breaks, for a total of about 6 hours in an 8 hours workday; sit, with normal breaks, for a total of about 6 hours in an 8 hours workday; and his ability to push and/or pull was unlimited (R. 227).  The Plaintiff could occasionally climb ramps and climb stairs; and could occasionally balance, stoop, kneel, crouch, and crawl (R. 228).  Plaintiff had no manipulative, visual (R. 229), communicative or environmental limitations (R. 229-30).  Plaintiff's gait was stable, he was able to walk for 1 mile, indicating he was able to be up on his feet throughout the day (R. 232).

On February 9, 2001, Plaintiff was assisting a friend moving and while moving file cabinets he injured his left wrist.  X-rays of his left wrist were unremarkable (R. 396).  On September 17, 2001, because of left wrist pain the Plaintiff was seen by Michael Baghdoian, M.D., a board certified orthopaedic surgeon (R. 236-237).  Plaintiff indicated that he drank a six pack of beer per day, and he was being treated for diabetes with oral agents (R. 237).  An EMG on September 28, 2001, of the Plaintiff's left upper extremity was unremarkable (R. 245).  An MRl scan of the Plaintiff's left wrist on October 9, 2001, was unremarkable (R. 247).  On October 17, 2001, an MRI scan of the Plaintiff's left elbow was unremarkable (R. 249).

On October 26, 2001, Dr. Baghdoian reported the Plaintiff described his pain as about a 2 out of 10 (R. 250).  The Plaintiff was fully retired and had not worked since January 1996.  The MRI studies he had of his left wrist were negative and recent MRI studies of his left elbow were also negative.  The EMG was negative.  Plaintiff had a fairly good range of motion in his left shoulder, no contracture, there was good supination and pronation as well.  The contralateral right side was completely normal and had an excellent range of motion and power.  Pulses were "bounding" (sic) bilaterally; there was good contouring without evidence by inspection and palpation of trophic changes.  Neurologic examination was normal as well with normal retlexes for biceps, triceps and brachioradialis.  Dr. Baghdoinan's impression included sprain residuals of injury to the Plaintiff's left wrist and tenosynovitis of his left elbow without evidence by MRI testing of intrinsic pathology and EMG study ruled out neuropathy and/or radiculopathy (R. 251).

On February 18, 2002, the Plaintiff was seen by his family physician, Jonathon P. State, M.D. (R. 256)(R. 397).  Plaintiff's diabetes was being treated with Glucophage, but his diabetes was in poor control, so treatment with Glucovance was added.  Plaintiff then claimed he only

drank alcohol two to three times per month.  The Plaintiff was found to have abnormal liver function tests. He was also found to be hypertensive and was started on Monopril.

Dr. State reported range of motion of the Plaintiff's spinal area was unknown (R. 254). Dr. State had not done regular back exams recently because the Plaintiff was already on disability.  Dr. State was unaware of any nerve root irritation, seated and supine straight leg raising test or electromyography.  Dr. State did not know of any muscle spasm, the Plaintiff's ability to walk on his heels and/or toes, walk, squat, climb stairs, or get on and off an examination table.  Recent observations of gait were normal and the Plaintiff did not use an ambulation aid.  Dr. State was unaware of any atrophy (R. 255).

On April 9, 2002, David Bradford Barker, M.D., board certified in physical medicine and rehabilitation, examined Plaintiff at the request of his representative (R. 259).  Plaintiff stated he took medications for diabetes and he smoked one package of cigarettes each day (R. 260). Plaintiff was 6'3" tall and he weighed 314 pounds.  Lumbar spine motion was normal.  Plaintiff could walk on his heels and toes, and he could squat and return from a squat without difficulty. Strength in the extremities was normal, and sensation in both feet and hands was normal.  Seated straight leg raising was normal.  July 2001 left wrist x-rays were normal (R. 261).  Dr. Barker opined Plaintiff would be disabled from any industrial work at Ford Motor Company.

Dr. Barker completed a Medical Assessment of Physical Residual Functional Capacity form after his examination of Plaintiff (R. 262).  Plaintiff could occasionally lift up to 20 pounds; stand/walk 4 hours a day, 45 minutes at a time; sit 4 hours a day, 90 minutes at a time; alternate positions every 5 hours; frequently reach, grasp and manipulate; occasionally push/pull; avoid using foot controls; avoid stairs, ladders, bending, stooping, kneeling and crawling; occasionally twist his back; frequently turn his neck; and occasionally be around unprotected

heights and moving machinery (R. 262-63).  Dr. Barker saw Plaintiff one time in April 2002,

but he reported Plaintiff had this residual functional capacity ("RFC") since 1996 (R. 263).

An April 15, 2002, MRI of the lumbar spine showed L5-S1 disc bulge with neural

foraminal compromise, more to the left, L4-5 central disc bulge with annular tear and mild the

cal sac compression, and no other abnormalities (R. 257-58).

On June 18, 2002, a state agency Enhanced Examiner Miriam H. Wirttanen  reviewed

Plaintiff's medical record, and assessed Plaintiff's ability to work (R. 265-72).  Ms. Wirttanen

also initially denied the claim on July 3, 2002 (R.  45).  Examiner Wirttanen found that Plaintiff

could lift and/or carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk 6

hours a workday (with normal breaks), and sit (with normal breaks) for 6 hours a workday (R.

266).  Plaintiff was limited in pushing/pulling with his upper extremities.  Plaintiff could

occasionally climb scaffolds, ramps and stairs, and he could occasionally balance, stoop, kneel,

crouch, and crawl (R. 267).  Plaintiff could do frequent, not constant handling (gross

manipulation) with the left hand, and he was unlimited in reaching in all directions, fingering

and doing fine manipulation (R. 268).  Plaintiff had to avoid concentrated exposure to vibration

(R. 269).

Plaintiff's representative submitted a form that Plaintiff's treating family physician,

Jonathan P. State, M.D., completed on July 18, 2002, after examining Plaintiff on July 9, 2002

(R. 274-75).  It indicated that Plaintiff could stand and walk up to 6 hours a day, carry up to 30

pounds for 30 minutes a day, carry up to 20 pounds for 60 minutes a day, and he was limited in

grasping (R. 275).   Previously, on March 21, 2002, Dr. State acknowledged that he was not that

familiar with the Plaintiff's musculoskeletal impairments (R. 254-255).  Dr. State was unaware

of the Plaintiff's spinal area range of motion, he had not done regular back examinations, was

8

unaware of any nerve root irritations test, seated and straight leg raising, electromyography, unaware of any muscle spasm; unaware of the Plaintiff's ability to walk on his heels, toes, walk, squat, climb stairs, or get on and off an examination table. Recent observations of gait were also normal at that time (R. 255).

Hand surgeon, Robert S. Barbosa, D.O., examined Plaintiff on July 30, 2002 (R. 372). Plaintiff was 6'3" and weighed 320 pounds. Plaintiff complained of discomfort involving his left wrist and about his right third finger which was triggering (R. 372). Shoulder, finger and elbow motion was normal. Right hand and left wrist x-rays were normal. Left wrist MRI performed in October 2001, showed no abnormalities (R. 371). In October 2002, Dr. Barbosa performed arthroscopy to the Plaintiff's left wrist, there is no copy of the report in the medical evidence of record. Allegedly, a scapholunate injury was found and radiofrequency thermal treatment was applied to the injured ligament. A thumb spica cast was then applied (R. 369, 397).

On August 29, 2002, the physician noted that regarding Plaintiff's diabetes mellitus, generally there was good glucose control (R. 313).

On October 1, 2002, bilateral shoulder abduction and elbow flexion were one-half of normal (R. 370). On October 9 and 14, 2002, strength, reflexes, and sensation in the lower extremities were normal (R. 310, 312).

On November 16, 2002, Dr. D.B. Choi, a state examiner (R. 226), reviewed the record and concluded that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk a maximum of 6 hours per workday; and sit a maximum of 6 hours per workday (R. 227).

On January 17, 2003, Plaintiff was again seen by orthopaedic surgeon  Baghdoian regarding his left shoulder pain (R. 348-349, 397). X-rays of the Plaintiff's left shoulder

revealed a spur about the distal clavicle.  A diagnosis of left shoulder impingement syndrome was made (R. 349).  An MRI scan of the Plaintiff's left shoulder on January 29, 2003, revealed no evidence of a rotator cuff tear (R. 347).  There was evidence of tendonopathy and of acromioclavicular joint arthritis.  On July 21, 2003, Dr. Baghdoian performed an arthroscopy on the Plaintiff's left shoulder and found a full thickness rotator cuff tear for which physical therapy was prescribed before surgery (R. 338).  In December 2003, because of ongoing complaints of discomfort about his left shoulder, Dr. Baghdoian performed an open arthrotomy of the Plaintiff's left shoulder and performed a rotator cuff repair (R. 334, 398).

In January and August 2004, Plaintiff's diabetes mellitus was under good control (R. 285, 292).

On April 21, 2004, apparently because of triggering, Dr.  Barbosa performed a flexor tenolysis on the Plaintiff's right third digit (R. 356).  On June 22, 2004, Plaintiff was again seen by Dr. Barbosa (R. 352).  Plaintiff complained of discomfort about his right third proximal interphalangeal joint.  No x-rays were obtained, but a diagnosis of early degenerative arthritis was made, and that joint was injected with steroids.

On May 28, 2004, Dr.  Baghdoian reported the Plaintiff's left shoulder pain was abated, he had come along very nicely since his January arthroscopic debridement and shoulder repair (R. 331).

On December 12, 2004, Dr. Arthur Lorber, a board-certified orthopedic surgeon, reviewed Plaintiff's medical record and assessed Plaintiff's RFC from April 1, 2002, through December 31, 2001 (R. 395-400).  Dr. Lorber reported that Plaintiff was 73 inches tall, weighed 320 pounds, was right handed, had been off work since January 1996; however, his amended onset date was April 2002 (R. 395).  Between 1990 and 1996, the Plaintiff was treated for

10

episodes of low back pain which radiated to his right leg (R. 396).  On August 5, 1996, the Plaintiff underwent diskectomy on the right side at L5-S1 (R. 210).  Plaintiff ceased working and remained off work since 1996, had been receiving long term disability benefits from his employer since 1996.  About July 2000, Plaintiff was diagnosed as having diabetes mellitus, but was treated by diet alone (R. 396).

Dr. Lorber's impression included pathologic obesity; status postoperative diskectomy LS-S1, with no objective clinical evidence of ongoing lumbar radiculopathy; history of fracture, right ankle, in the remote past (1980) treated with open reduction and internal fixation, resulting in slight limitations of motion; status postoperative open repair of a rotator cuff tear, left shoulder; status postoperative arthroscopy left wrist, for scapuholunate ligament injury; and status postoperative flexor tendon tenolysis, right third digit, for triggering, with no evidence of reoccurrence (R. 398).

It was Dr. Lorber's opinion the Plaintiff's impairments do not meet or equal Section 1.04, Appendix I, Subpart P, Regulations No.4, with regard to his lumbar spinal condition.  The Plaintiff's impairments do not meet or equal Section 1.02A, Appendix I, Subpart P, Regulations No.4, with regard to his right ankle condition.  The Plaintiff's impairments do not meet or equal Section 1.02B, Appendix 1, Subpart P, Regulations No.4, with regard to his left shoulder condition and/or his left wrist condition, and/or his right finger condition. The combination of the Plaintiff's medical impairments is not of sufficient severity to equal any listing.

The physician found Plaintiff could lift and/or carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk 6 hours a workday (with normal breaks), and sit (with normal breaks) for 6 hours a workday (R. 401).  Plaintiff was limited in pushing/pulling with his upper extremity (no frequent pushing/pulling with left upper extremity and no restrictions with

11

right upper extremity).  Plaintiff could occasionally climb ramps and stairs, never climb ropes,

ladders or scaffolds, never balance or crawl, and occasionally stoop, kneel, or crouch (R. 402).

Plaintiff's ability to reach in all directions, including overhead, and handle and do gross

manipulations was limited with his left upper extremity; and he had no limitation reaching in all

directions, including overhead, handling, performing gross manipulations fingering, performing

fine manipulations or feeling with his right upper extremity (R. 403).  Plaintiff had to avoid all

exposure to hazards such as machinery and heights, avoid moderate exposure to wetness and

vibration, and he could have unlimited exposure to temperature extremes, humidity, noise,

fumes, odors, dusts, gases and poor ventilation (R. 404).  Dr. Lorber later answered written

questions from Plaintiff's representative ( R.412-13).  Dr. Lorber stated that in making his

conclusions he considered the impact of Plaintiff's obesity upon his other impairments (R.

411-13).

### Evidence Submitted after the July 29, 2005, decision to the Appeals Council [2]

Plaintiff submitted evidence to the Appeals Council after the ALJ's decision (R. 414-

29).  That evidence includes a September 2005 note from Dr. Barker that explained the

difference between seated and supine straight leg raising, and that Plaintiff was not fabricating

his supine response (R. 426, 428).  Dr. Barker also reported Plaintiff's MRI findings were

sufficiently abnormal for Plaintiff to avoid factory work, and Plaintiff's symptoms were

---

[2] Because this evidence was not before the ALJ when he rendered the final decision of
the Commissioner, it cannot be considered for substantial evidence review.  *See Wyatt v.
Secretary of Health and Human Services*, 974 F.2d 680, 685 (6th Cir. 1992).  The only purpose
for which this Court can consider this additional evidence is to determine whether this case
should be remanded to the agency pursuant to the sixth sentence of 42 U.S.C. § 405(g). *Cotton v.
Secretary of Health and Human Services*, 2 F.3d 692, 695-96 (6th Cir. 1993).  This court may
remand the case if the additional evidence is new and material, and if there was good cause for
failure to incorporate the additional evidence into the record at a prior hearing.  42 U.S.C. §
405(g) (sentence six); *See Wyatt*, 974 F.2d at 685; *Casey v Secretary of Health and Human
Services*, 987 F.2d 1130, 1233 (6th Cir. 1993).

sufficiently mild that additional back surgery would not be recommended (R. 427).

### 3.  *Vocational Evidence*

VE Corn testified that Plaintiff's past work as a welding machine operator is usually classified at the medium exertional level and is considered unskilled work, SVP of 2. (R. 451-452).  The VE confirmed that Plaintiff performed the work at this level and skill.

The ALJ asked VE Corn the following hypothetical:

> We have a individual who is male.  As of his Date Last Insured, he would have been 51 years of age.  High school graduate. We have in this case, we have some evidence of lumbar degenerative disk disease.  We do have a lumbar MRI in April of 2002 showing diffuse disk bulge at L5-S1 with some bilateral neural foraminal compromise, more towards the left. He also had a past history of a right laminectomy at that level.  He had a central disk bulge L4-S. We also had at least some complaints of difficulties as identified by the representative through questioning of his right hand, left wrist, left shoulder.  This individual has the following capabilities for performing sustained work activities.  Before the start of the hearing I did give you the file.  The first opinion we have of record is that of Dr. Barker of record, Exhibit 12F, 1 and following.  I'm going to give you time to refresh your recollection as to those work restrictions.  Off the record.

(R. 452).

After refreshing her recollection as to the work restrictions proposed by Dr. Barker, the ALJ asked VE Corn whether that hypothetical individual could perform Plaintiff's past work as he actually performed it or as it is customarily performed in the national economy.  VE Corn indicated that he would not be able to perform his past work and that there were no transferable skills (R. 453).  Moreover, the VE indicated that this hypothetical person could also not perform a significant number of jobs in the state economy.  That April 15, 2002, assessment by Dr Barker limited Plaintiff to 4 hours sitting and 4 hours standing in an 8 hour work day ( R. 262).

The ALJ then asked a second hypothetical using the same facts as listed in hypothetical number one, but substituting the work restrictions of Dr. Barker at Exhibit 12F with those of the non-examining review of Enhanced Examiner Miriam Wirtanen of the Michigan Disability

Determination Bureau, which is found at Exhibit 14F, 1 and following (R. 454 referring to R. 265). That report had the same lifting/carrying weights as Dr. Barker, but indicated the ability to do work with 6 hours sitting and 6 hours standing in an 8 hour work day (R. 266). The VE asked for further clarification in terms of manipulative limitations which notes limitations in the upper eternities (R. 266) referring to section C (R. 268). The ALJ stated that section C is indicating that Plaintiff is unlimited in reaching in all directions, including overhead, fingering, fine manipulation is unlimited, feel and skin receptors are unlimited and gross manipulation or handling could be done frequently, but not constantly (R. 455).

VE Corn testified that the hypothetical individual would be unable to perform Plaintiff's past work due to the weight limitation and the restriction placed on gross manipulation (R. 456). Again, there were no transferable skills. The VE testified, however, that there would be positions available in the state of Michigan that would meet this hypothetical at the unskilled and light exertional level, including approximately 2,000 security guard jobs, 4,000 courier positions, 3,000 inspector jobs and 4,000 jobs as a hand packager. The source of her statistics was the *Occupation Employment Quarterly* for the Third Quarter of 2004 for the state of Michigan.

For hypothetical number three, the ALJ asked the VE to assume that he presented functional restrictions that were consistent with Plaintiff's statements at the hearing regarding his limitations (R. 458). VE Corn indicated that such a person would not be able to perform any jobs.

After the hearing, the ALJ submitted an interrogatory to the VE regarding what jobs an individual like Plaintiff could perform through December 31, 2002, his date last insured, assuming he could do work as described by Dr. Lorber at Exhibit 19F prepared December 12, 2004 (R. 400-07). That assessment, indicated the ability to do work with 6 hours sitting and 6

14

hours standing in an 8 hour work day with no frequent pushing or pulling with the left upper

extremity and limited reaching in all directions and gross manipulation  (R. 401 & 403).  Ms.

Corn replied that in Michigan, such a person could perform about 7,000 light unskilled jobs as a

general office clerk, inspector, and machine operator, and about 6,000 sedentary unskilled jobs

as an information clerk, general office clerk, and machine operator (R. 193).  Ms. Corn

explained that the source for her statistics was the *Occupational Employment Quarterly* for the

third quarter of 2004, for the state of Michigan.

### 4.      *ALJ Tranovich's Decision*

ALJ Tranovich found that Plaintiff met the special earnings requirements of Title II of

the Social Security Act through April 1, 2002, the date the claimant stated he became unable to

work, and continued to meet them through December 31, 2002, his date last insured (R. 29).

Moreover, Plaintiff had not engaged in substantial gainful activity relevant since April 1, 2002.

The ALJ found that the medical evidence establishes that the claimant has pathologic obesity;

status postoperative diskectomy L5-S I, with no objective clinical evidence of ongoing lumbar

radiculopathy; history of fracture, right ankle, in remote past (1980) treated with open reduction

and internal fixation, resulting in slight limitation of motion; status postoperative open repair,

rotator cuff tear, left shoulder; status postoperative arthroscopy left wrist, for scapuholunate

ligament injury; status postoperative flexor tendon tenolysis, right third digit, for triggering, with

no evidence of reoccurrence, but the Plaintiff does not have an impairment or

combination of impairments listed in or medically equal to one listed in Appendix 1, Subpart P,

Regulations No. 4 (Dkt. #30).

The ALJ opined that Plaintiff's subjective complaints of pain and/or any other

symptomatology, such that the Plaintiff experiences pain and/or any other symptomatology by

reason of a medically determinable physical or mental impairment which establishes that the Plaintiff does not have the residual functional capacity to perform any work which exists in significant numbers in the national economy, are not supported by the objective medical evidence of record, nor by the treatment notes and records from the Plaintiff's treating physicians, nor by the reports from the consultative examiners, and are not credible.

ALJ Tranovich determined that Plaintiff had the RFC from April 1, 2002, through December 31, 2002, the date the Plaintiff last met the special earnings requirement of Title II of the Social Security Act, to occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk, with normal breaks, for a total of about 6 hours in an 8 hours workday; sit, with normal breaks, for a total of about 6 hours in an 8 hours workday; and his ability to push and/or pull was limited in his upper extremity. Plaintiff should avoid frequent pushing and/or pulling with his left upper extremity, but has no restrictions with his right upper extremity (Ex. 19F, p. 7). Plaintiff should never climb ladders, ropes, or scaffolds; should never balance or crawl; can occasionally climb ramps and climb stairs; and can occasionally stoop, kneel, and crouch (Ex. 19F, p. 8). Plaintiff's ability to reach in all directions, including overhead, and handle, perform gross manipulations is limited using his left upper extremity, but he has no limitations or restrictions regarding reaching in all directions, including overhead, handling, performing gross manipulations, fingering, performing fine manipulations or feeling with his right upper extremity (Ex. 19F, p. 9). Plaintiff has no visual limitations (Ex. 19F, p. 9), or communicative limitations (Ex. 19F, p. 10). Plaintiff should avoid all exposure to hazards such as heights and machinery; should avoid even moderate exposure to wetness and vibration; but has no limitations or restrictions regarding exposure to extreme cold, extreme heat, humidity, noise, fumes, odors, dusts, gases, or poor ventilation (Ex. 19F, p. 10).

Plaintiff's activities of daily living were not restricted; Plaintiff did not have any difficulties in maintaining social functioning; Plaintiff did not have any difficulties in maintaining concentration, persistence, or pace; and the Plaintiff had never experienced any episodes of decompensation, each of extended duration, each lasting for at least two weeks, due to any emotional, mental, psychological, or psychiatric impairment (R. 30-31).

The ALJ found that Plaintiff could not perform his past relevant work and did not have any skills which were transferable to the skilled or semiskilled work functions of other work which Plaintiff could perform. Yet, he concluded that Section 404.1569 of Regulations No. 4, and Rules 202.13 and 202.14, Table No. 2, Appendix 2, Subpart P, Regulations No. 4 indicate a finding of not disabled is appropriate. Even if Plaintiff was not able to perform a full and complete range of light unskilled work activity from April 1, 2002, through December 31, 2002, there were numerous light unskilled occupations throughout the state of Michigan Plaintiff could perform. Examples of such occupations include light unskilled general office clerks, 4,000 jobs; light unskilled inspectors, 2,000 jobs; light unskilled machine operators, 1,000 jobs (Ex. 21E, p. 1). There would also be sedentary unskilled information clerks, 3,000 jobs; sedentary unskilled general office clerks, 2,000 jobs; and sedentary unskilled machine operators, 1,000 jobs. Even subsequent to April 1, 2002, the date the claimant attained 51 years of age, he was still capable of performing the light unskilled occupations enumerated by the VE (Ex. 21 E, p. 1).

Accordingly, it was the decision of the ALJ Tranovich that based on the Application for Disability Insurance Benefits filed on February 12, 2002, Plaintiff was not entitled to a period of disability or disability insurance benefits under Sections 216(i) and 223 of the Social Security. Act, because the claimant was not disabled on or before December 31, 2002, the date the Plaintiff last met the special earnings requirement of Title II of the Social Security Act (R. 32).

## II.  ANALYSIS

### A.  __Standards of Review__

In adopting federal court review of Social Security administrative decisions, Congress limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence.  *See* 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and Human Servs.*, 757 F.2d 803, 804 (6th Cir. 1985).  Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion.  *Mullen v. Brown*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

If the Commissioner seeks to rely on vocational expert testimony to carry her burden of proving the existence of a substantial number of jobs that Plaintiff can perform, other than her past work, the testimony must be given in response to a hypothetical question that accurately describes Plaintiff in all significant, relevant respects.  A response to a flawed hypothetical question is not substantial evidence and cannot support a finding that work exists which the Plaintiff can perform.  *See, e.g., Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (hypothetical question must accurately portray Plaintiff's physical and mental impairments); *Cole v. Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-76 (6th Cir. 1987) (Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the Plaintiff's impairments."); *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987) ("The question must

state with precision the physical and mental impairments of the Plaintiff."); *Myers v. Weinberger*, 514 F.2d 293, 294 (6th Cir. 1975); *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975).

**B.     Factual Analysis**

In his motion for summary judgment Plaintiff argues that ALJ Tranovich erred as follows: (1.) by not specifying which impairments he found to be severe, thus not enabling a subsequent examiner to properly evaluate the ALJ's decision; (2.) by failing to evaluate Plaintiff's obesity pursuant to Social Security Ruling ("SSR) 02-1p; (3.) by improperly assessing Plaintiff's credibility regarding his subjective symptoms; (4.) by failing to rely on the opinion of Plaintiff's treating physicians; and (5.) by improperly finding that there were a significant number of jobs that Plaintiff could perform because the VE's testimony was in conflict with the *Dictionary of Occupational Titles*.

**1.     Plaintiff's Severe Limitations**

Plaintiff claims that the ALJ did not specify which impairments he found to be severe, thus not enabling a subsequent examiner to properly evaluate the ALJ's decision (Dkt. #17, pp. 7-8).  A fair reading of the ALJ's decision confirms he found that Plaintiff had severe impairments of pathologic obesity; status postoperative discectomy at L5-S1, with no objective evidence of ongoing lumbar radiculopathy; history of fracture of the right ankle in the remote past, treated with open reduction and internal fixation, resulting in slight limitation of motion; status postoperative open repair of left rotator cuff tear; status postoperative arthroscopy of the left wrist for a ligament injury; and status postoperative flexor tendon tenolysis of the right third digit, for triggering, with no evidence of recurrence (R. 15, 17, 29-30).

The ALJ explained the format that he used in assessing Plaintiff's impairments (R. 16-

19

17).  *See* 20 C.F.R. §§ 404.1520(a)(4)(ii)(iii).  ALJ Tranovich stated that at step 2 of the

sequence, he had to consider whether Plaintiff had a severe (more than minimal) impairment,

and that at step 3, he had to consider that if Plaintiff had a severe impairment, did it meet or

equal a listed impairment.  The ALJ considered all of the critical evidence of record, and he

reasonably determined Plaintiff had pathologic obesity; status postoperative discectomy at L5-

S1, with no objective evidence of ongoing lumbar radiculopathy; history of fracture of the right

ankle in the remote past, treated with open reduction and internal fixation, resulting in slight

limitation of motion; status postoperative open repair of left rotator cuff tear; status

postoperative arthroscopy of the left wrist for a scapuholunate ligament injury; and status

postoperative flexor tendon tenolysis of the right third digit, for triggering, with no evidence of

recurrence (R. 29-30).  The ALJ then continued on with the sequential evaluation and reasonably

determined that Plaintiff did not have an impairment or combination of impairments that met or

equaled a listed impairment (R. 30).

Because the ALJ considered and determined that Plaintiff's impairments did not meet or

equal a listed impairment, he reasonably found as a condition precedent that Plaintiff's obesity,

and back, right ankle, left shoulder, left wrist and right finger conditions were severe (R. 15, 17,

29-30).

### 2.    Plaintiff's Obesity

Plaintiff also claims that the ALJ failed to evaluate his obesity pursuant to SSR 02-1p

(Dkt. #17, pp. 8-9, 16).  As the Policy Interpretation Ruling states, the previous listed

impairment, 9.09, with regard to obesity was deleted.  Yet, Social Security made "some changes

to the Listings to ensure that obesity is still addressed in our Listings.  In the final rule, we added

a paragraph to the prefaces of the musculoskeletal, respiratory, and cardiovascular body system

listings that provides guidance about the potential effects obesity has in causing or contributing to impairments in those body systems" (*id.* at 1). Here, Plaintiff alleges an impairment of the musculoskeletal system.

The provisions of SSR 02-01p "remind adjudicators that the combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately" (*id*. at 1). The ruling discusses how obesity affects physical and mental health, stating as follows:

> Obesity is a risk factor that increases an individual's chances of developing impairments in most body systems. It commonly leads to, and often complicates, chronic diseases of the cardiovascular, respiratory, and musculoskeletal body systems. Obesity increases the risk of developing impairments such as Type II (so-called adult onset) diabetes mellitus – even in children; gall bladder disease; hypertension; heart disease; peripheral vascular disease; dyslipidemia (abnormal levels of fatty substances in the blood); stroke; osteoarthritis; and sleep apnea

(*id*. at 3).[3]

The ALJ's decision indicates that he was aware of Plaintiff's obesity because throughout his entire decision, the ALJ discussed Plaintiff's obesity (R. 18-20, 22-23, 28-30). In addition, the ALJ explained that he gave greater consideration to Dr. Lorber's RFC assessment because Orthopedic surgeon Lorber reviewed all of the medical evidence of record and considered the impact of Plaintiff's obesity in making his conclusions (R. 20-21, 25, 28). In reviewing the record, it is apparent that Dr. Lorber considered Plaintiff's medical record, including Plaintiff's weight, he diagnosed Plaintiff with pathologic obesity, he determined that Plaintiff's impairments did not meet or equal a listing, he determined that Plaintiff could perform a range of light work, and he specifically explained that in making his conclusion, he considered the impact of Plaintiff's obesity upon his other impairments (R. 395-407, 410-13). There is no obvious

---

[3] Plaintiff points out that he was not diagnosed, during the period in question, with diabetes (Dkt. #17, p. 9).

indication that in assessing Plaintiff's problems, the ALJ gave insufficient weight to the effect of Plaintiff's obesity on his other impairments.

### 3.      Plaintiff's Credibility

Plaintiff claims that in assessing his credibility regarding his subjective symptoms, the ALJ did not comply with the factors set forth in 20 C.F.R. § 404.1529 and in SSR 96-7p (Dkt. #17, p. 9).  He also alleges that the ALJ based his decision on medical evidence submitted prior to the alleged onset date of April 1, 2002 (Dkt. #17, p. 10).  Subjective evidence is only considered to "the extent . . . [it] can reasonably be accepted as consistent with the objective medical evidence and other evidence" (20 C.F.R. 404.1529(a)).  The ALJ is not required to accept a claimant's own testimony regarding allegations of disabling pain when such testimony is not supported by the record.  *See Gooch v. Sec'y of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987).  The issue of a claimant's credibility regarding subjective complaints is within the scope of the ALJ's fact finding discretion.  *Kirk v. Secretary of health & Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981); *Jones v. Commissioner of Social Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).

In order for an ALJ to properly discredited a claimant's subjective testimony, the credibility determination must be accompanied by a detailed statement explaining the ALJ's reasons.  S.S.R. 96-7p directs that findings on credibility cannot be general and conclusory findings, but rather they must be specific.  The ALJ must say more than the testimony is not credible.  *Felisky v. Bowen*, 35 F.3d 1027, 1039 (6th Cir. 1994), made it clear that the ALJ cannot merely recount the medical evidence and claimant's daily activities and then without analysis summarily conclude that the overall evidence does not contain the requisite clinical,

diagnostic or laboratory findings to substantiate the claimant's testimony regarding pain. *Id*. at 1039.

Contrary to Plaintiff's assertion, the ALJ in this case considered all of Plaintiff's symptoms in accordance with 20 C.F.R. § 404.1529 and SSR 96-7p, and had substantial evidence from the critical time period to discredit Plaintiff's subjective testimony. In evaluating Plaintiff's credibility from April 1, 2002, to December 31, 2002, the ALJ considered the objective medical evidence, medication that Plaintiff took, no medication side effects, other treatment Plaintiff underwent and Plaintiff's activities of daily living (R. 18-28).

The ALJ's determination of credibility is accorded great weight and deference particularly since the ALJ has the opportunity, which the court does not, of observing a witness's demeanor while testifying. *See Jones v. Commissioner of Social Security*, 336 F.3d 469, 476 (6th Cir. 2003); *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) (the ALJ is afforded special deference in his credibility determination because of his unique opportunity to observe the claimant and judge her subjective complaints); *Walters v. Commissioner of Social Security*, 127 F.3d 525, 531 (6th Cir. 1997) ("[T]he ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility."). The ALJ's credibility finding is amply supported by the record and entitled to deference. *Gooch v. Secretary of Health and Human Services*, 833 F.2d 589, 592 (6th Cir. 1987); *Villarreal v. Secretary of Health and Human Services*, 818 F.2d 461, 464 (6th Cir. 1987).

Here, the ALJ considered all of the medical evidence that related to Plaintiff's obesity, diabetes mellitus, left wrist, left elbow, left shoulder, right finger, and back, and he reasonably

determined the evidence through December 31, 2002, did not support Plaintiff allegations of

pain (R. 218-28).  The critical diagnostic evidence of record from April 1, 2002, through

December 31, 2002, showed that MRI of the lumbar spine revealed L5-S1 disc bulge with neural

foraminal compromise, more to the left, L4-5 central disc bulge with annular tear and mild thecal

sac compression, and no other abnormalities (R. 257-58).  The Sixth Circuit has affirmed

findings that claimants with more significant impairments were not disabled.  *See Blacha v.*

*Secretary of Health and Human Services*, 927 F.2d 228, 230-31 (6th Cir. 1990) (affirming

finding of not disabled where claimant had nerve root compression due a herniated disc, as well

as degenerative changes in the spine).  In addition, MRI of the left shoulder and left wrist, and x-

rays of the right hand were completely normal (R. 261, 371-72, 347).

The clinical evidence from April 1, 2002, through December 31, 2002, also did not

support Plaintiff's allegations of pain.  An examination showed Plaintiff could walk on his heels

and toes, and could squat and return from a squat without difficulty (R. 260).  Lumbosacral

spine and finger motion was normal, bilateral shoulder and elbow motion ranged from normal to

reduced, and seated straight raising was unrestricted (R. 260, 370, 372).  Sensation in the hands

and lower extremities was intact, and reflexes in the lower extremities were normal (R. 260,

310, 312).  In addition, there were no strength deficits in the extremities (R. 260, 310, 312).  The

ALJ considered the objective medical evidence and he reasonably determined that the evidence

did not support Plaintiff's allegations.

In assessing Plaintiff's credibility, the ALJ considered medications Plaintiff took, other

treatment modalities he underwent, and Plaintiff not having any medication side effects.  The

ALJ found that Plaintiff had diabetes mellitus that was controlled with medication and diet (R.

19-20, 23, 260, 285, 292, 313).  An impairment that is controlled with medication is not

disabling.  *See Gist v. Secretary of Health and Human Services*, 736 F.2d 352, 356-57 (6th Cir.

1984).  The ALJ also considered medication Plaintiff took for hypertension, treatment for the left

wrist, treatment for his left shoulder problem, and treatment for his right finger condition (R.

18-20, 23, 26, 28).  In addition, based on the critical evidence of record from April 1, 2002, to

December 31, 2002, the ALJ reasonably found that Plaintiff took no significant pain medication,

and he did not experience any significant side effects from any medication (R. 28, 178).

In assessing Plaintiff's credibility, the ALJ also considered Plaintiff's activities (R. 22-

23).  Plaintiff cooked, occasionally used the dishwasher, sometimes did the laundry, occasionally

vacuumed (R. 172-73, 447).  He also drove, cared for his cat, and watched birds and squirrels

(R. 446, 448).  Plaintiff's allegations belie his allegations of disabling pain and symptoms.  In

assessing Plaintiff's credibility, the ALJ gave several reasons and provided sufficient support for

not finding Plaintiff totally credible (R. 18-28).

In support of his claim that the ALJ's credibility finding was deficient, Plaintiff

relies on *Rogers v. Commissioner of Social Security*, 486 F.3d 234, 249 (6th Cir. 1997) (Dkt.

#17, p. 11).  In *Rogers*, the Court held that the ALJ never provided specific reasons for his

credibility finding.  *Rogers*, 486 F.3d at 239.  In *Rogers*, however, the plaintiff had fibromyalgia,

which the Court noted was unlike medical conditions that can be confirmed by objective testing,

and which presents no alarming signs and which an over-emphasis on objective findings was

inappropriate.  *Rogers*, 486 F.3d at 243-44, 248.  In this case, Plaintiff had medical conditions

that could be confirmed by objective testing, and thus Plaintiff's reliance on *Rogers* is

misplaced.

### 4.    Plaintiff's Treating Physicians

Plaintiff claims that the ALJ improperly did not rely on the opinion of his treating

physicians (Dkt. #17, pp. 12-14).  Plaintiff then points out that in April 2002, Dr. Barker saw

Plaintiff and then checked off on a form, provided by Plaintiff's attorney, that Plaintiff could

occasionally lift up to 20 pounds; stand/walk 4 hours a day, 45 minutes at a time; sit 4 hours a

day, 90 minutes at a time; alternate positions every 5 hours; frequently reach, grasp and

manipulate; occasionally push/pull; avoid using foot controls; avoid stairs, ladders, bending,

stooping, kneeling and crawling; occasionally twist his back; frequently turn his neck; and

occasionally be around unprotected heights and moving machinery (R. 262-63).

It is well established that the findings and opinions of treating physicians are entitled to

substantial weight.  The case law in this circuit has stated that if adequately supported by

objective findings, and if uncontradicted by other substantial medical evidence of record, a

treating physician's opinion of disability is binding on the Social Security Administration as a

matter of law.  *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions

and diagnoses of treating physicians are generally accorded substantial deference, and if the

opinions are uncontradicted, complete deference"); *King v. Heckler*, 742 F.2d 968, 973 (6th Cir.

1984) (same); *Lashley v. Secretary of HHS*, 708 F.2d 1048, 1054 (6th Cir. 1983) (same); *Bowie

v. Harris*, 679 F.2d 654, 656 (6th Cir. 1982); *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir.

1980). The administrative decision could reject a properly supported treating physician's opinion

of disability if the record contains "substantial evidence to the contrary." *Hardaway v. Sec'y of

HHS*, 823 F.2d 922, 927 (6th Cir. 1987).

Under the Social Security Administration regulations, the Commissioner will generally

give more weight to the opinions of treating sources, but it sets preconditions for doing so. 20

C.F.R. §404.1527.  The Commissioner will only be bound by a treating source opinion when it is

"well supported by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with other substantial evidence in your case record." 20 C.F.R. § 404.1527(d); *See also*, S.S.R. 96-2p.

Yet, the conclusion of whether a Plaintiff is "disabled" is a decision reserved to the Commissioner to decide (R. 19).  20 C.F.R. §§ 404.1527(e)(1), (2), 416.927(e)(1), (2).  And, "[w]e will not give any special significance to the source of an opinion on an issue reserved to the Commissioner." *Id*. at §§ 404.1527(e)(3), 416.927(e)(3).  Here, the ALJ weighed Dr. Barker's opinion in accordance with controlling law, and he reasonably determined Plaintiff could do a range of light work (R. 24-27, 30).  The regulations and case law recognize that the opinion of a physician, including a treating physician, is entitled to great weight only if it is supported by adequate medical data, including medical signs and laboratory findings, and does not conflict with other evidence.  20 C.F.R. § 404.1527(d)(2)(3)(4); *Walters*, 127 F.3d at 530.

As an initial matter, Dr. Barker is not Plaintiff's treating physician (R. 259-62).  Dr. Barker examined Plaintiff at the request of his representative and he completed a Medical Assessment of Physical Residual Functional Capacity form that was provided by Plaintiff's representative (R. 259, 262-63).  Moreover, Dr. Barker saw Plaintiff one time in April 2002, and he had no basis other than what Plaintiff might have told him that Plaintiff had this RFC since 1996 (R. 263).

In addition, the ALJ provided specific reasons why he did not rely on Dr. Barker's opinion (R. 24-26).  The ALJ explained that he reasonably did not rely on this opinion because it was not supported by Dr. Barker's own normal clinical findings, and Dr. Barker did not perceive the results of Plaintiff's MRI scan to be significant because he never referred Plaintiff to a specialist (R. 23-26).  The MRI findings and Dr. Barker's own clinical findings did not support his April 2002 opinion.  As the ALJ noted, Dr. Barker's clinical findings of the Plaintiff "were

normal and all within normal limits (Ex. 11F, pp. 1-3)" (R. 25).  During Dr. Barker's evaluation, Plaintiff stated he took medications for diabetes and he smoked one package of cigarettes each day (R. 260).  Plaintiff was 6'3" tall and he weighed 314 pounds.  Lumbar spine motion was normal.  Plaintiff could walk on his heels and toes, and he could squat and return from a squat without difficulty.  Strength in the extremities was normal, and sensation in both feet and hands was normal.  Seated straight leg raising was normal.  July 2001 left wrist x-rays were normal (R. 261).

Where a physician's conclusions regarding a claimant's physical capacity contains no substantiating medical data or other evidence, the ALJ is not required to credit such opinions. *Cutlip v. Secretary of Health and Human Services*, 25 F.3d 284, 287 (6th Cir. 1994).  The ALJ reasonably did not rely on Dr. Barker's opinion.

Plaintiff also claims that the ALJ improperly did not rely on the opinion of his treating physician, Dr. State (Dkt. #17, pp. 14-16).  Dr. State provided his opinion after last seeing Plaintiff in February 2002 (R. 254-55), before Plaintiff's alleged onset date of April 1, 2002.  Dr. State's opinion does not relate to the critical period of time.  Plaintiff's representative later submitted the state agency examiner's assessment to Dr. State who then provided a July 2002, RFC of Plaintiff that disagreed with that assessment (R. 274-75).  The ALJ considered Dr. State's opinion and he reasonably did not rely on that opinion because Dr. State was unfamiliar with Plaintiff's musculoskeletal condition, and consequently, Dr. State's opinion was not supported by any objective medical findings (R. 19, 23, 25).  It was therefore reasonable for the ALJ to not rely on Dr. State's opinion.

The ALJ in this case was permitted to give greater weight to the board-certified orthopedic surgeon Arthur Lober who provided extensive discussion and responded to interrogatories written by Plaintiff's representative.

### 5.      VE Corn's Testimony

Plaintiff also claims that the ALJ improperly found that there was a significant number of jobs that Plaintiff can perform because the VE's testimony was in conflict with the *Dictionary of Occupational Titles* (Dkt. #17, pp. 18-19). The VE stated that the source for her statistics as to the number of jobs Plaintiff can perform is the *Occupational Employment Quarterly* (R. 193, 456- 57). The reliability of government publications is not subject to challenge because the agency already has taken administrative notice of the reliability of job information from government publications. *See* 20 C.F.R. § 416.966(d). The data in the *Occupational Employment Quarterly*, which the VE relied on, is derived from government sources. *See* http://www.uspublishing.net/references.html. Since the publication is based on other government publications or data, of which the Agency generally takes administrative notice, the ALJ reasonably relied on the VE's testimony that was based on this resource.

### 6.      Evidence Submitted to The Appeals Counsel

In conjunction with his request for review of the ALJ's decision by the Appeals Council, Plaintiff presented evidence to the Appeals Council, and he relies on some of this evidence to support his claim of disability (Dkt. #17, pp. 13-14). Where a party presents new evidence on appeal to the Appeals Council that denies review or to the federal court for the first time, the Court can consider the evidence only to determine if a remand is appropriate under sentence six of 42 U.S.C. § 405(g) for further consideration of the evidence but only if the party seeking remand shows that the new evidence is new and material, and if there was good cause for failure

to incorporate the additional evidence into the record at a prior hearing.  42 U.S.C. § 405(g)

(sentence six); *See Hollon ex rel. Hollon v. Commissioner of Social Security*, 447 F.3d 477,

483-84 (6th Cir. 2006).

The evidence Plaintiff submitted and relies on post-dates Plaintiff's date last insured and

the ALJ's decision. That evidence includes a September 2005 note from Dr. Barker  (R. 426-28).

This evidence purports to be new because it relates to new information about Plaintiff's

condition prior to his date last insured of December 31, 2002.  This new information, however, is

not material because it does  not provide any significant basis for changing the ALJ's decision.

Thus, a remand for the ALJ to consider it is not appropriate.

The statement from Dr. Baghdoian opines that Plaintiff cannot lift over ten pounds with

his left upper extremity and cannot do over head work.  While these restrictions are greater than

those of Dr. Lorber, there are no medical references or explanations of this opinion other than a

recitation of the medical history that was also available to Dr. Lorber and the ALJ.  There is

nothing sufficiently new in this to warrant a remand.

In addition, Plaintiff has not attempted to establish good cause for his failure to obtain all

this evidence earlier.  To meet the good cause requirement mandated by the statute, Plaintiff

must have a valid reason for his failure to provide these records earlier.  *See Hollon ex*

*rel Hollon*, 447 F.3d at 485.  Plaintiff has failed to satisfy the good cause requirement of section

405(g).  This case should, therefore, not be remanded for consideration of this additional

evidence.

In this case, the ALJ relied on the significant evidence within the record and reasonably

determined that from April 1, 2002, to December 31, 2002, Plaintiff was not disabled but could

perform a range of light work that included a significant number of jobs.  Consequently,

substantial evidence supports the Agency's decision that the Plaintiff was not disabled.

## III.   RECOMMENDATION

For the reasons stated above, it is **RECOMMENDED** that Plaintiff's Motion for Summary

Judgment be **DENIED** and Defendant's Motion for Summary Judgment be **GRANTED**.  The

parties to this action may object to and seek review of this Report and Recommendation, but are

required to file any objections within ten (10) days of service of a copy hereof as provided for in

28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections

constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard*

*v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638

F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others

with specificity, will not preserve all the objections a party might have to this Report and

Recommendation.  *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir.

1991); *Smith v. Detroit Fed'n of Teachers Local, 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).

Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this

Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the

opposing party may file a response.  The response shall be not more than twenty (20) pages in

length unless by motion and order such page limit is extended by the Court.  The response shall

address specifically, and in the same order raised, each issue contained within the objections.


Dated: February 10, 2009                          s/ Steven D. Pepe
Ann Arbor, MI                                     United States Magistrate Judge

I certify that a copy of the foregoing document was mailed to counsel of record by electronic and/or ordinary mail.


                                                s/D. Opalewski

February 10, 2009                             Deputy Clerk